*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

HOME-OWNERS INSURANCE COMPANY,

Plaintiff-Appellant,

v

CENTRAL MUTUAL INSURANCE COMPANY
and LIBERTY MUTUAL INSURANCE
COMPANY,

Defendants-Appellees,

and

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY,

Defendant.

UNPUBLISHED
December 12, 2019

No. 345627
Eaton Circuit Court
LC No. 2017-001232-NF

Before: SWARTZLE, P.J., and MARKEY and REDFORD, JJ.

PER CURIAM.

Plaintiff Home-Owners Insurance Company (Home-Owners), appeals as of right the trial court's grant of summary disposition for defendants Central Mutual Insurance Company (Central) and Liberty Mutual Insurance Company (Liberty Mutual) regarding the domicile of Brent Hannahs at the time that a motor vehicle collided with his bike causing him severe injuries and later death. The trial court determined that Brent domiciled with Merna Rasmussen, his grandmother, whom Home-Owners provided no-fault insurance. The trial court held that Home-Owners, as the responsible insurer, bore liability for paying all of Brent's no-fault personal injury protection benefits (PIP benefits). We affirm.

## I. FACTS

After living with friends and acquaintances from age 17 and a half when he stopped living with his father, Clint Hannahs, in Eaton Rapids, Brent asked and received permission to move in with Rasmussen at 4712 Laurie Lane, Lansing, Michigan. Brent moved in with her so that he could find employment, save his money, and ultimately be able to get his own place to live with his girlfriend. Brent began living with Rasmussen on August 26, 2016. She helped him by buying him suitable clothing and drove him around Lansing so that he could apply for jobs. He obtained employment at Famous Dave's, a barbeque restaurant in Holt, and he remained living at Rasmussen's house until November 6, 2016, when, while riding his bike to a friend's house in Lansing, a tow truck operated by Shroyer Development Corp. (Shroyer) collided with him at the intersection of Martin Luther King Boulevard South and West Jolly Road in Lansing, Michigan. Brent was 19 years old at the time of his accident and later died.

Home-Owners sued for declaratory judgment and damages alleging that Brent lacked domicile at Rasmussen's house at the time of his accident and that it had no statutory obligation to pay for Brent's PIP benefits. Home-Owners alleged that Liberty Mutual, Clint's insurer, or Central, Shroyer's insurer, or State Farm Automobile Insurance Company (State Farm), Roxanna Hannahs, Brent's mother's insurer, had the obligation to pay Brent's PIP benefits and reimburse Home-Owners for the benefits it paid.

Following discovery, Home-Owners and State Farm stipulated to State Farm's dismissal, and with approval of the other parties, the trial court dismissed State Farm with prejudice. Home-Owners, Liberty Mutual, and Central each moved for summary disposition under MCR 2.116(C)(10). The trial court denied Home-Owners' motion and granted Liberty Mutual's and Central's respective motions after analyzing the evidence presented by the parties and deciding that Brent domiciled with Rasmussen at the time of his accident. Home-Owners moved for reconsideration but the trial court denied the motion because Home-Owners merely presented the same issues that it ruled upon and failed to demonstrate a palpable error. Home-Owners now appeals.

## II. STANDARDS OF REVIEW

We review de novo a trial court's decision on a motion for summary disposition. *Lowrey v LMPS & LMPJ, Inc*, 500 Mich 1, 5-6; 890 NW2d 344 (2016). We review de novo questions involving statutory interpretation. *Dobbelaere v Auto-Owners Ins Co*, 275 Mich App 527, 529; 740 NW2d 503 (2007). We also review "de novo a trial court's decision on a motion for summary disposition in an action for a declaratory judgment." *Lansing Sch Ed Ass'n v Lansing Bd of Ed (On Remand)*, 293 Mich App 506, 512-513; 810 NW2d 95 (2011). A motion for summary disposition under MCR 2.116(C)(10) challenges the "factual adequacy of a complaint on the basis of the entire record, including affidavits, depositions, admissions, or other documentary evidence." *Gorman v American Honda Motor Co, Inc*, 302 Mich App 113, 115; 839 NW2d 223 (2013). A trial court's grant of summary disposition under MCR 2.116(C)(10) is proper when the evidence, "viewed in the light most favorable to the nonmoving party, show[s] that there is no genuine issue as to any material fact and the moving party is therefore entitled to judgment as a matter of law." *Lowrey*, 500 Mich at 5. "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an

issue upon which reasonable minds might differ." *Gorman*, 302 Mich App at 116 (citation omitted). "A domicile determination is generally a question of fact; however, where the underlying material facts are not in dispute, the determination of domicile is a question of law for the circuit court." *Grange Ins Co v Lawrence*, 494 Mich 475, 490; 835 NW2d 363 (2013) (citation omitted).

## III. ANALYSIS

Michigan's no-fault act defines the responsible insurer required to pay PIP benefits in accidents in which a person becomes injured in a motor vehicle accident while not an occupant of a motor vehicle. At the time of the adjudication of this case, MCL 500.3115 provided in relevant part:

> (1) Except as provided in subsection (1) of section 3114, a person suffering accidental bodily injury while not an occupant of a motor vehicle shall claim personal protection insurance benefits from insurers in the following order of priority:

> (a) Insurers of owners or registrants of motor vehicles involved in the accident.

> (b) Insurers of operators of motor vehicles involved in the accident.

MCL 500.3114(1) provides in relevant part that a personal protection insurance policy "applies to accidental bodily injury to the person named in the policy, the person's spouse, and a relative of either domiciled in the same household, if the injury arises from a motor vehicle accident." Because Brent suffered bodily injury arising from a motor vehicle accident while not a passenger in a motor vehicle, the determination of which insurer bore responsibility to pay Brent's PIP benefits required analyzing and deciding where Brent domiciled at the time of his accident.

In *Grange*, our Supreme Court considered two cases that presented related issues under Michigan's no-fault act: (1) where minor children of divorced parents were domiciled, and (2) whether a family court order establishing custody of minor children conclusively established the minor children's domicile for purposes of determining coverage under MCL 500.3114(1). *Grange*, 494 Mich at 481. In this context, our Supreme Court clarified the law regarding domicile as follows:

> For over 165 years, Michigan courts have defined "domicile" to mean "the place where a person has his true, fixed, permanent home, and principal establishment, and to which, whenever he is absent, he has the intention of returning." Similarly, a person's domicile has been defined to be " 'that place where a person has voluntarily fixed his abode not for a mere special or temporary purpose, but with a present intention of making it his home, either permanently or for an indefinite or unlimited length of time.' " In this regard, the Court has recognized that "[i]t may be laid down as a settled maxim that every man must have such a national domicile somewhere. It is equally well settled that no person can have more than one such domicile, at one and the same time." From this settled principle, it follows that

a man retains his domicile of origin [upon his birth] until he changes it, by acquiring another; and so each successive domicile continues, until changed by acquiring another. And it is equally obvious that the acquisition of a new domicile does, at the same instant, terminate the preceding one.

In this way, our common law has recognized that from the time of a person's birth—from childhood through adulthood—a person can only have a single domicile at any given point in time. Indeed, there are few legal axioms as established as the one providing that every person has a domicile, and that a person may have one—and *only* one—domicile.

In furtherance of this understanding of domicile, the common law has necessarily distinguished between the concepts of "domicile" and "residence:"

The former, in its ordinary acceptation, was defined to be, 'A place where a person lives or has his home,' while '[a]ny place of abode or dwelling place,' however temporary it might have been, was said to constitute a residence. A person's domicile was his legal residence or home in contemplation of law.

Stated more succinctly, a person may have only one domicile, but more than one residence. For purposes of distinguishing "domicile" from "residence," this Court has explained that "domicile is acquired by the combination of residence and the intention to reside in a given place . . . . If the intention of permanently residing in a place exists, a residence in pursuance of that intention, however short, will establish a domicile." The traditional common-law inquiry into a person's "domicile," then, is generally a question of intent, but also considers all the facts and circumstances taken together.

Returning to the language of MCL 500.3114(1), there is no indication that the Legislature intended to deviate from this well established common-law meaning of the term "domicile." And, because a person, from the moment of his birth onward, can only have one domicile within the traditional meaning of that term, it follows that a child, regardless of his parents' marital status or his multiple legal residences, may also have only one domicile at any given point in time. [*Id*. at 493-495 (citations omitted, alteration in original).]

Our Supreme Court held "that a child, whose parents are divorced and who has more than one legal residence, may have only a single domicile at any one point in time that continues until the child acquires a different one." *Id*. at 496. The Court explained that domicile is not the equivalent of residence under MCL 500.3114(1). The Court clarified that, in *Workman v Detroit Auto Inter-Ins Exch*, 404 Mich 477, 496-497; 274 NW2d 373 (1979), it did not establish such an equivalency rule. For purposes of the no-fault act, " 'domicile' must be understood consistent with its historical underpinnings." *Grange*, 494 Mich at 500.

For determination whether a person is "domiciled in the same household" as described in MCL 500.3114(1), our Supreme Court explained that the multifactor domicile test it established in *Workman* "is analytically the same as the traditional domicile test employed for more than a century at common law" and "entirely consistent with our conclusion that the term 'domicile' is to be interpreted the same as its common-law meaning." *Id*. at 499-500. Our Supreme Court did not abandon the *Workman* multifactor domicile test. On the contrary, *Grange* clarified that the *Workman* factors should be considered and analyzed for determining an adult's domicile, but not for minor children because they are persons with a legal disability who lack the capacity to acquire a domicile of choice. *Id*. at 501-502. The Court explained that,

> for purposes of our legal system, an unemancipated child, unlike a competent adult, lacks the legal capacity to make legally binding determinations for him or herself and, therefore, a child lacks the *capacity* to acquire a domicile of choice. Thus, while intent is critical for determining the domicile of an adult, a child's intent regarding domicile is simply irrelevant, and the traditional factors applied in determining an adult's domicile are likewise irrelevant. [*Id*. at 502-503 (emphasis in original).]

In this case, while a minor child, in relation to Clint's and Roxanna's 2008 divorce, a court awarded Clint sole physical custody of Brent. Brent, however, left Clint's custody at age 17½, and never returned. The record reflects that Brent turned 18 years old while living separately from both of his parents. Because Brent emancipated himself from Clint and suffered his accident as an adult shortly after his 19th birthday, under *Grange*, the traditional factors for determining his domicile were both relevant and dispositive for determining Brent's domicile at the time of his accident. Accordingly, the trial court properly considered and weighed the *Workman* factors.

In *Workman*, 404 Mich at 496-497 (citations omitted), our Supreme Court prescribed the following flexible nonexclusive factors for the determination of an adult's domicile:

> In considering these factors, no one factor is, in itself, determinative; instead, each factor must be balanced and weighed with the others. Among the relevant factors are the following: (1) the subjective or declared intent of the person of remaining, either permanently or for an indefinite or unlimited length of time, in the place he contends is his "domicile" or "household"; (2) the formality or informality of the relationship between the person and the members of the household; (3) whether the place where the person lives is in the same house, within the same curtilage or upon the same premises; (4) the existence of another place of lodging by the person alleging "residence" or "domicile" in the household.

In this case, evidence established that Brent intended to make Rasmussen's house his domicile. Respecting the first *Workman* factor, evidence established that Brent, an adult, approached Rasmussen voluntarily and independently to request her permission to live with her in her home for an indefinite and unlimited length of time. Rasmussen testified that Brent did not specify the duration of his stay or set a time by which he intended to vacate the premises. She also testified that she set no time limit for his stay. She understood Brent's plan for the future because he explained to her that he desired to live in Lansing to enable him to find

employment, work and earn money, save his earnings, and later, once he had saved enough money, find his own place to live. Clint testified that Brent shared with him his future plans that required an indefinite length of time to come to fruition. Rasmussen's testimony established that she understood that Brent's plan would take time and she supported him without limitation as to the amount of time it might take him to fulfill it. Witnesses testified that before Brent moved in with Rasmussen he led a transient life and stayed with friends or acquaintances but never established a long-term residence or domicile at any one place. The record evidence does not establish that, after he turned 18 years old in September 2015 until he moved in with Rasmussen in August 2016, he established his domicile anywhere. Nevertheless, as of August 2016, the record reflects that Brent moved in with Rasmussen with the intent to stay there indefinitely. The evidence, therefore, established that the first *Workman* factor favored finding that Brent intended to establish his domicile at Rasmussen's house.

Respecting the second and third *Workman* factors, the record establishes that Brent had a close familial relationship with Rasmussen, his grandmother. She opened her home to him and provided him his own bedroom, permitted him to move his personal belongings into her house, bought him clothing to enable him to obtain employment, bought him a bike so that he had transportation, provided him transportation by driving him around town, and permitted him to use her home freely without limitation. The evidence, therefore, established that these *Workman* factors favored finding that Brent made Rasmussen's house his domicile.

Regarding the fourth *Workman* factor, the evidence indicates that, from August 2016 until the date of his accident on November 6, 2016, Brent had no other place to stay. Clint testified that Brent permanently left him at age 17½ and never returned to stay a single night. Brent's brother took over Brent's bedroom, disposed of his remaining belongings, remodeled the room, and made it his own. Roxanna testified that she had none of Brent's personal belongings at her house other than some clothes he may have left there when he left her house in 2013 to return living with Clint. She also testified that whatever he had at the time of his death was at Rasmussen's house. Although she stated that he could have stayed at her house in his former bedroom if he wanted to do so, she admitted that he had not resided with her since 2013 when he moved back in with Clint. She also admitted that he did not stay any night at her house while he lived at Rasmussen's house. The record indicates that, from August 2016 until the date of his accident on November 6, 2016, Brent returned every night to Rasmussen's house and slept every night there. The fourth *Workman* factor, therefore also favored finding that Brent domiciled at Rasmussen's house.

Home-Owners argues that Brent still had a room at Roxanna's house. The record, however, lacks evidence that the room remained available because Brent desired that or intended to ever move back there. Analysis of the record indicates that Roxanna may have desired his return and kept a room available, but no evidence establishes that she offered Brent a room or even suggested that he move in with her so that he could work and save money for his future plan. Roxanna's conduct does not establish Brent's intent regarding domicile.

In *Dairyland Ins Co v Auto-Owners Ins Co*, 123 Mich App 675, 682; 333 NW2d 322 (1983), a panel of this Court stated that, in addition to the factors articulated in *Workman*:

Other relevant indicia of domicile include such factors as whether the claimant continues to use his parents' home as his mailing address, whether he maintains some possessions with his parents, whether he uses his parents' address on his driver's license or other documents, whether a room is maintained for the claimant at the parents' home, and whether the claimant is dependent upon the parents for support.

Although *Dairyland* is not binding authority because it was decided before 1990,[1] in *Williams v State Farm Mut Auto Ins Co*, 202 Mich App 491, 494-495; 509 NW2d 821 (1993) (citations omitted), this Court affirmed the propriety of using the *Dairyland* factors for domicile determination and slightly modified them as follows:

(1) the person's mailing address; (2) whether the person maintains possessions at the insured's home; (3) whether the insured's address appears on the person's driver's license and other documents; (4) whether a bedroom is maintained for the person at the insured's home; and (5) whether the person is dependent upon the insured for financial support or assistance.

The trial court considered the *Dairyland* factors as part of its analysis. It did not err in this regard. The *Dairyland* factors as articulated in *Williams* also favored finding that Brent made Rasmussen's house his domicile. Regarding Brent's mailing address, we note the record reflects that Brent identified Rasmussen's house address as his home address for his employer. Brent's W-2 stated Rasmussen's address as Brent's home address and his check stub from his employment with Famous Dave's also identified Rasmussen's address as Brent's home address. When Brent sought treatment from an urgent care facility while staying at Rasmussen's house, Brent gave the urgent care facility Rasmussen's address as his home mailing address. The record indicates that the urgent care facility sent bills to Brent at Rasmussen's address. Further, Roxanna testified in her statement that Rasmussen received a phone bill in the mail for Brent after his death.

Home-Owners argued to the trial court and here on appeal that Brent's bank account featured Roxanna's home address. The record, however, contains no documentary evidence that supports that assertion. Roxanna stated in her statement taken by Home-Owners' counsel that she thought she received a bank account statement at her address. However, during her deposition when interrogated in this regard, she lacked certainty. Whether Brent's bank statements were mailed to her address cannot be verified on the record presented to this Court. The record lacks clarity regarding when Brent opened his bank account. Witnesses testified that he had his account at Huntington Bank and did his banking at the Meijer store branch near Rasmussen's house. Home-Owners did not attach Brent's bank records to its submissions to the trial court and has not supplemented the record with such evidence for its appeal. Although

---

[1] Cases decided before November 1, 1990, are not binding precedent, MCR 7.215(J)(1), but they may be considered as persuasive authority. *Aroma Wines & Equip, Inc v Columbian Dist Servs, Inc*, 303 Mich App 441, 453 n 4; 844 NW2d 727 (2013), aff'd and remanded 497 Mich 337 (2014), reh den 498 Mich 877 (2015).

unsupported by documentary evidence, the record reflects that defendants never challenged or rebutted Home-Owners' assertion. Accordingly, Home-Owners' assertion may be true but merely uncorroborated by supporting documentary evidence. Because the parties did not dispute the evidence, under *Grange*, the trial court was required to consider all the evidence and determine Brent's domicile as a matter of law. The trial court, therefore, could weigh and balance the undisputed evidence when applying the *Workman* and *Dairyland* factors for its determination. The record does not reflect that the trial court failed to do so and it did not err by according greater significance to Brent's verified use of Rasmussen's house address as his own with his employer and medical service provider while living with Rasmussen.

Home-Owners also argues on appeal that Clint received some of Brent's mail at his house. The record, however, does not support that contention. Clint testified only that he still got mail from bill collectors for Brent's medical bills following his death. He did not testify that he routinely received Brent's mail during Brent's life as an adult or during his stay at Rasmussen's house. Analysis of the record evidence establishes that Brent signified to two entities that Rasmussen's house address served as his mailing address. The record is unclear whether he may not have changed his address or notified others respecting his use of Rasmussen's address as his own. Nevertheless, based upon the record evidence, the trial court could reasonably conclude that the first *Dairyland* factor favored finding that Brent domiciled at Rasmussen's house.

Respecting the second *Dairyland* factor, the record reflects that all of Brent's personal belongings were taken by him to Rasmussen's house and maintained there. The record indicates that he had few belongings at the time of his move to Rasmussen's because either his friends or acquaintances had taken his personal belongings or he abandoned them. This *Dairyland* factor, therefore, favored finding that Brent domiciled at Rasmussen's house.

The evidence in this case indicates that the third *Dairyland* factor did not weigh for or against finding that Brent domiciled at Rasmussen's house. The record reflects that Brent obtained a driver's license at age 16, but lost it because of unpaid tickets. Rasmussen testified that she assisted Brent when he turned 16 years old in getting his driver's license but she did not know what address it may have had. Roxanna speculated that he had her house address on his license but she could not testify with certainty in that regard. Clint did not testify during his deposition regarding Brent's driver's license. Home-Owners asserts that Brent's driver's license featured Clint's house address. Nothing in the record before the trial court or presented to this Court corroborates that assertion. The parties did not present any evidence, documentary or otherwise, that established what address his driver's license identified as his home address.

Regardless, the record reflects that after Rasmussen took Brent to obtain a state identification card, it stated Roxanna's address as Brent's address. The parties speculate as to why that happened but no witness testimony or other evidence establishes why Brent's state identification card identified Roxanna's house address as his home address. Whether Brent told the Secretary of State that address is unknown and one can only speculate in that regard. Nevertheless, Brent's state identification card did not feature Rasmussen's address. This fact weighs against finding that Brent domiciled at Rasmussen's house.

Other documentary evidence in the record, however, established that Brent identified Rasmussen's house address as his home address. As mentioned previously, Brent gave Rasmussen's house address as his own to his employer who featured her address on his W-2 for his earnings during 2016 while working at Famous Dave's. Further, Brent's check stub from that employer featured Rasmussen's house address as Brent's address. The urgent care medical records also indicated that Brent gave that facility Rasmussen's house address as his home address.

Viewing all of the evidence related to the third *Dairyland* factor does not permit a decisive determination that Brent uniformly used Rasmussen's house address. Accordingly, one cannot reasonably conclude that this factor unequivocally favored finding that Brent domiciled at Rasmussen's house.

The fourth *Dairyland* factor, by contrast, clearly favored finding that Brent domiciled at Rasmussen's house. The record reflects that Brent had his own bedroom at Rasmussen's house that was maintained for his use.

Respecting the fifth *Dairyland* factor, the record reflects that Brent depended on Rasmussen for food, shelter, and transportation. Rasmussen opened her home to Brent, gave him unrestricted freedom to use her appliances, and let him eat when and what he liked. She also supported his efforts to find employment by buying him suitable clothing and by driving him around town to apply for jobs. Further, she bought him a bike so that he could get to and from his job. Because of her financial support and assistance, Brent had a place to stay indefinitely and the ability to work toward achieving his goal of future independence. Neither Clint nor Roxanna provided Brent financial support or other substantive material assistance. This *Dairyland* factor, therefore, also favored finding that Brent domiciled at Rasmussen's house.

The evidence in this case supports finding that the *Workman* factors all favored finding that Brent domiciled at Rasmussen's house. The evidence also supported finding that four out of five of the *Dairyland* factors favored finding that Brent domiciled at Rasmussen's house. Accordingly, the trial court did not err by ruling that Brent domiciled at Rasmussen's house at the time of his accident.

Home-Owners argues that Brent merely resided but never domiciled at Rasmussen's house. This argument lacks merit. The evidence in this case does not support Home-Owners' contention. Rather, the evidence establishes that Brent chose to move in with Rasmussen and through his actions and conversations with her indicated his intent to affix his abode at her house and remain with her indefinitely and for an unlimited length of time. He returned to Rasmussen's house every night for the two and a half months he lived there, had all of his personal belongings there, and had nowhere else to go. Brent could not legitimately call Clint's house home, nor did any evidence support that he ever intended to remain domiciled at that house since he became an adult. The trial court, therefore, did not err by ruling that, as a matter of law, Brent domiciled at Rasmussen's house at the time of his accident and that Home-Owners had the obligation to pay his PIP benefits.

Therefore, the trial court properly applied the law to the undisputed facts in this case and correctly determined that Brent domiciled at Rasmussen's house at the time of his accident. The

trial court correctly ruled that Home-Owners was the priority no-fault insurer with the statutory obligation to pay Brent's PIP benefits.

Affirmed. As the prevailing parties, Liberty Mutual and Central may tax costs. MCR 7.219.

/s/ Brock A. Swartzle
/s/ Jane E. Markey
/s/ James Robert Redford